Darrell J. NICKELSON and R. A.
"Dick" Mader, Appellants
(Defendants),

v.

PEOPLE of the State of Wyoming,
Appellees (Plaintiffs).

No. 5179.

Supreme Court of Wyoming.

Feb. 21, 1980.

Michael A. Maycock, Gillette, and Fred R. Esser, P.A., Phoenix, Ariz., argued, for appellants.

John D. Troughton, Atty. Gen., and Marta Adams, Asst. Atty. Gen., argued, for appellees.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., retired.*

RAPER, Chief Justice.

The appellants, Darrell J. Nickelson and R. A. "Dick" Mader, appeal from a judgment of the district court entered in an action to recover a penalty for violation of the Environmental Quality Act after a jury's verdict determined that the appellants: (1) did construct or install a public water supply system at Nickelson Little Farms, (2) did modify a public water supply system at Nickelson Little Farms, and (3) were required by Wyoming law to secure a permit to construct, install, or modify a public water supply system at Nickelson Little Farms. The judgment recited the verdict [1] and imposed a penalty of $10,-

---

* ROONEY, J., having recused himself from participation in this case, GUTHRIE, J., Retired, was assigned, having been retained in active judicial service pursuant to § 5, Art. V, Wyoming Constitution and § 5–1–106(f), W.S.1977, by order of the court entered on January 1, 1979.

1. The recitation of the verdict in the judgment is really quite inaccurate. Nonetheless, the parties both approved the judgment as to form and the judge signed it. No party has raised any issue in this regard, and we do not consider it to be a problem insofar as undermining the validity of the judgment. We point it out so as to identify the inaccuracy and to demonstrate that we did not overlook it.

The verdict:
"1. Did the Defendants, Darrell J. Nickelson and R. A. 'Dick' Mader construct or install a public water supply at Nickelson Little Farms?

000.00 on the defendants and entered judgment therefor.

We will affirm.

The appellants were partners in a business venture to subdivide land near Gillette, Wyoming. The subdivision was known as Nickelson Little Farms. At first, only two of the 93 five-acre plots in the subdivision sold; and appellants determined that the cause was that the lots were not affordable to most prospective purchasers because the combined cost of a down payment on the land and drilling of a well was prohibitively high. To encourage sales, they accordingly decided to undertake a project to make water available to the acreages. The appellant Mader, acting for himself and his partner Nickelson, formed a corporation called Nickelson Little Farms Water Company. It was intended that water would be made available to each of the lots through that company. No stock in the company issued to Mader or Nickelson, and according to appellant Mader's own testimony, it would issue to buyers of lots as they made their purchases so that in the end the residents of Nickelson Little Farms would own the stock in the water company.

After formation of the water company, appellant Mader had a well drilled, a 35,000 gallon storage tank installed, and a loop line was put in the ground which the owner of each acreage was entitled to hook into if desired.[2] Sales of the acreage improved and most, if not all, of the lots sold.

A Department of Environmental Quality (DEQ) field engineer took note of the subdivision and looked into what was, in his estimation, a public water supply system for which no permit[3] had been issued by DEQ. DEQ officials made contact with appellants and pointed out the problem. Further, DEQ demanded that appellants obtain a permit and provide DEQ with a set of plans for the water supply system as installed; appellants did neither.[4]

In the meantime, residents of the subdivision complained to appellants about the water supply's inadequacy in several regards. Appellant Mader testified that at

---

"Answer: Yes
"2. Did the Defendants, Darrell J. Nickelson and R. A. 'Dick' Mader, modify a public water supply at Nickelson Little Farms?
"Answer: Yes
"If you have answered either Question 1 or 2 'yes', answer Question 3.
"3. Were the Defendants, Darrell J. Nickelson and R. A. 'Dick' Mader, required by Wyoming Statute to secure a permit to construct and install or to modify the water supply at Nickelson Little Farms?
"Answer: Yes
The judgment, stating that it was quoting the verdict, read:
"1. Was the water supply at Nickelson Little Farms a public water supply? YES
"2. Did the Defendants, R. A. 'Dick' Mader and Darrell J. Nickelson form a partnership? YES
"3. Did the Defendants, R. A. 'Dick' Mader and Darrell J. Nickelson construct, install, modify or operate a public water supply in their individual or partnership capacity? YES
In the absence of any objection, we assume the appellants were content to let the judgment stand and appeal only those asserted errors identified in their brief.

2. The residents were not required to connect, but they *had* to buy stock in the company (minimum $1,500.00) when they purchased

their acreage (each acreage could buy up to four hookups).

3. § 35–11–301. *Prohibited Acts.*
"(a) No person, except when authorized by a permit issued pursuant to the provisions of this act, shall:
    *     *     *     *     *     *
"(v) Construct, install, modify or operate any public water supply."
§ 35–11–103. *Definitions.*
"(a) For the purpose of this act, unless the context otherwise requires:
    *     *     *     *     *     *
"(c) Specific definitions applying to water quality:
    *     *     *     *     *     *
"(viii) 'Public water supply' means any water supply being distributed by ten (10) or more service connections utilized to furnish water for human consumption either in preparing foods or beverages for inhabitants of residences of business establishments."

4. Although it is of no consequence insofar as the outcome of this case is concerned, appellants claim to have refused because the State filed a lawsuit. The State countered this and claimed that they filed suit only after appellants failed to comply after eight months and several contacts.

the request of the stockholders of the water company certain alterations were made in the water supply system including increasing the storage capacity to 80,000 gallons, adding a booster pump to improve water pressure to certain areas of the subdivision, and incorporating a chlorinator.

The appellants raise five issues, which we shall treat in logical sequence rather than as presented by the parties:

(1) Sections 35–11–104, et seq., W.S.1977, and the creation of the Department of Environmental Quality are unconstitutional and an unlawful derogation of the powers created by Art. VIII, § 2, Wyoming Constitution.[5]

(2) The proceedings were criminal in nature, not civil, and the requirement that the appellants testify was in violation of their right not to be required to testify against themselves in criminal proceedings in violation of the Fifth Amendment, U.S. Constitution,[6] and Art. I, § 11, Wyoming Constitution.[7]

(3) Sections 35–11–101, et seq., W.S.1977, are unconstitutional because they are in violation of Art. I, §§ 1, 2, 3, 6, and 7, Wyoming Constitution[8] and the Fourteenth Amendment of the U.S. Constitution.[9]

(4) The district court erred in failing to direct a verdict for appellants at the close of all the evidence.

(5) The trial court committed reversible error in failing to submit to the jury a special form of verdict which would have allowed the jury to find that Nickelson Little Farms Company, a Wyoming corporation, constructed, installed, modified or operated a public water supply system.

■ Appellants assert that the statutes in question here are unconstitutional and illegally infringe on the powers vested in the State Engineer by Art. VIII, § 2, Wyoming Constitution. This issue was not addressed to the trial court. Where unconstitutionality of a statute is not raised in the trial court, we, as a reviewing court, will not hear the matter. *Knudson v. Hilzer*, Wyo.1976, 551 P.2d 680, 686 (and authorities cited therein).[10] This is nothing more than

---

**5.** "There shall be constituted a board of control, to be composed of the state engineer and superintendents of the water divisions; which shall, under such regulations as may be prescribed by law, have the supervision of the waters of the state and of their appropriation, distribution and diversion, and of the various officers connected therewith. Its decisions to be subject to review by the courts of the state."

**6.** Amendment V, United States Constitution: "No person shall * * * be compelled in any criminal case to be a witness against himself * * *."

**7.** Article I, § 11, Wyoming Constitution: "No person shall be compelled to testify against himself in any criminal case, * * *."

**8.** Article I, Wyoming Constitution:
Section 1.
"All power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety and happiness; for the advancement of these ends they have at all times an inalienable and indefeasible right to alter, reform or abolish the government in such manner as they may think proper."
Section 2.
"In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal."

Section 3.
"Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever other than individual incompetency, or unworthiness duly ascertained by a court of competent jurisdiction."
Section 6.
"No person shall be deprived of life, liberty or property without due process of law."
Section 7.
"Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

**9.** Amendment XIV, United States Constitution:
Section 1.
" * * * No State shall * * * deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

**10.** We point out in passing that appellants presented only the sketchiest of argument in favor of this proposition and absolutely no authority. It is another well-established rule of this court that where an appellant asserts error

a generic refinement of the general rule that we will not consider matters raised for the first time on appeal unless they go to jurisdiction or are otherwise of such a fundamental nature that the court must take cognizance of them. *Scherling v. Kilgore*, infra, 599 P.2d at 1358. We are persuaded that the question is neither related to the jurisdiction of this court nor so fundamental that we must take cognizance of it, and we will not consider the question further.

■ Appellants assert that the proceedings in this case were criminal in nature and thus they were compelled to testify against themselves in a criminal case in violation of their federal and state constitutional rights. Appellants assert that the penalty provision of the statutes [11] in question is criminal and not civil and therefore they could exercise their rights to remain silent in face of the accusations. To posit the issue plainly, it is: If we should determine that the proceedings were criminal, then the evidence relied upon by the State was protected, inadmissible, and requires reversal of the judgment in favor of the State.

■ This is an exceedingly problematic question. The authorities are deeply divided and an analytical framework is difficult to construct. In this instance, the legislature has determined that the penalty for violating the statute may be recovered in a civil action. The legislature has not assigned the term "criminal" to the violation. However, we hold that mere avoidance of the term "criminal" will not determine the criminal or civil nature of a statutorily defined offense and thus preclude the application of constitutional guarantees. "Constitutional guarantees have more substance than that." *Brown v. Multnomah County*

but cites no authority and makes only a perfunctory argument in support of the contention, this court will not consider the contention. *Scherling v. Kilgore*, Wyo.1979, 599 P.2d 1352, 1359.

11. *Section 35–11–901, W.S.1977:*

"(a) Any person who violates any provision of this act, or any rule, regulation, standard or permit adopted hereunder or who violates any determination or order of the council pursuant to this act or any rule, regulation, standard, permit, license, or variance is liable to a penalty of not to exceed ten thousand dollars ($10,000.00) for each day during which violation continues, which may be recovered in a civil action, and such person may be enjoined from continuing the violation as hereinafter provided. Damages are to be assessed by the court."

We are concerned only with § 35–11–901(a) and our determination in this regard is addressed only to that subsection. There may be additional concerns which arise with respect to other subsections of the penalties sections:

"(b) Any person who violates this act, rule, regulation, and thereby causes the death of fish, aquatic life or game or bird life is, in addition to other penalties provided by this act, liable to pay to the state, an additional sum for the reasonable value of the fish, aquatic life, game or bird life destroyed. Any monies so recovered shall be placed in the general fund of Wyoming, state treasurer's office. All actions pursuant to this article [§§ 35–11–901, 35–11–902] shall be brought in the county in which the violation occurred or in Laramie county by the attorney general in the name of the people of Wyoming.

"(c) Any person who willfully or negligently violates any provision of this act or any rule, regulation, standard, permit, license, or variance or limitations adopted hereunder or who willfully violates any determination or order of the council pursuant to this act or any rule, regulation, standard, permit or limitation issued under this act shall be fined not more than twenty-five thousand dollars ($25,-000.00) per day violation, or imprisoned for not more than one (1) year, or both. If the conviction is for a violation committed after a first conviction of such person under this act, punishment shall be by a fine of not more than fifty thousand dollars ($50,000.00) per day of violation or by imprisonment of not more than two (2) years, or by both.

"(d) Any person who knowingly makes any false statement, representation or certification in any application, record, report, plan or other document filed or required to be maintained under this act or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this act, shall upon conviction, be fined not more than ten thousand dollars ($10,000.00) or imprisoned for not more than six (6) months, or both.

"(e) Nothing in this act shall be construed to abridge, limit, impair, create, enlarge or otherwise affect substantively or procedurally the right of any person to damages or other relief on account of injury to persons or property and to maintain any action or other appropriate proceeding therefor."

*District Court*, 1977, 280 Or. 95, 570 P.2d 52, 57.

■ We adopt a test which uses five criteria to determine whether a, penalty imposed by the State is "criminal" or "civil." The test is one fashioned by the Oregon Supreme Court in *Brown v. Multnomah County District Court*, supra, 570 P.2d at 57–60. In adopting this test and applying it to the instant case, we have examined and now assimilate into our decision the same authorities[12] relied upon by that court. The five criteria are:

(1) *Type of offense.* Is the offense one which is traditionally or by its very nature criminal? If not, it may be considered to be civil.

(2) *Penalty.* What is the penalty and how severe is it? This has been isolated as the most significant factor, but it is by no means conclusive. Imprisonment may not be, used as punishment for a civil offense. The imposition of a fine or penalty may be entirely consistent with an offense being civil in nature. On the other hand, a fine or penalty may become so severe in the context of the circumstances in which it is imposed that the offense becomes criminal in nature and the constitutional protections associated with criminal prosecutions are necessarily called into play. An arbitrary dollar figure cannot be rigidly set as the touchstone. Rather, the amount of the fine must be weighed in view of all the circumstances relevant to the offense in question.

(3) *Collateral Consequences.* What other consequences are in the offing for the defendant in addition to the fine? Are, there such collateral consequences and are they regulatory in nature or do they impose additional punishment?

(4) *Punitive Significance.* This is perhaps the most difficult factor to weigh and the element of· subjectivity must be scrupulously avoided. We must inquire whether the offense is one primarily motivated by punitive intent. Is the statute plainly one that inflicts "punishment"? Does the judgment have stigmatizing or condemnatory significance?

(5) *Arrest and Detention.* Are the pretrial practices familiar to the criminal law utilized? If they are, that may serve to tip the balance in favor of a determination that the offense is criminal.

■ When we apply these factors to the offense in question, we reach the conclusion that the statute provides for a civil penalty and the appellants were not entitled to rely on their right to remain silent on the basis that the proceedings themselves were criminal in nature.[13]

(1) The offense is civil in nature. Environmental protection statutes are relatively new of development but certainly their origin is found in nuisance laws and common-law property rights for which the remedies were entirely civil in nature. In the face of an ever-deteriorating environment, the people through their governments have undertaken to limit further deterioration and actually to upgrade the environment by employing the powers of the State to stop dirtying of air and water, et cetera. Here we are primarily concerned with obtaining a permit to construct, install, operate,. or modify a public water supply system. The purpose of the statute is self-evident. A permit must be obtained. Before the State will issue the permit, the State satisfies itself that the public water supply system will be sound.[14] The purpose is to protect ·

**12.** *Kennedy v. Mendoza-Martinez*, 1963, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644; Charney, The Need for Constitutional Protections for Defendants in Civil Penalty Cases, 59 Corn.L.Rev. 478 (1974); Clark, Civil and Criminal Penalties and Forfeitures: A Framework for Constitutional Analysis, 60 Minn.L.Rev. 379 (1976).

**13.** This does not necessarily rule out the possibility that the right could be exercised on the grounds that their testimony would cause them to incriminate themselves in the light of some other statute or proceeding that is criminal.

**14.** Appellants do not challenge the rules and regulations (criteria) used by DEQ to determine if a public water supply system is sound, nor do they in any way challenge the procedure for applying to DEQ or the procedures followed in approving an application for a permit.

the public from impure water. This factor indicates the offense to be civil.

(2) The penalty for violation is a maximum of $10,000.00 for each day the violation continues. On its face, the penalty is severe. But our analysis must go somewhat deeper. The purpose of such a severe penalty is obviously a significant deterrent. However, the penalty is imposed not on an individual solely because of an individual act, but rather on one engaged in the pursuit of a profitable activity that affects the public generally. The activity is one most appropriate for regulation in the civil sector. This factor cannot be said to necessarily make the penalty criminal.

(3) We see no collateral consequences in this case. A violator may be enjoined from continuing a proscribed activity but that does not apply in this case. The appellants may be subject to additional civil actions to collect the fine but that is all. They may continue to pursue their activities. This suggests the penalty to be civil.

(4) We do not view the penalty as one which carries with it a moral stigma. It is not primarily motivated by punitive intent; rather, it is primarily motivated by a desire to regulate public water supply systems. This also suggests the penalty to be civil.

(5) The pretrial proceedings have none of the characteristics of the criminal practice. Indeed, in the early stages, the proceedings are wholly administrative. There is no arrest, no detention, and no other inhibitions are placed on the activities of those subject to the statute. The proceedings are entirely civil in nature.

Clearly the balancing test employed above results in the conclusion that the penalty is civil. We hold that it is civil and that the constitutional rights enumerated by the appellants were not violated by the civil proceedings had in this case.

Appellants assert that the statutes violate a great variety of state and federal constitutional guarantees. This is based primarily upon the assertion that the statute is underinclusive. The statute only regulates public water supply systems that have ten or more service connections. Appellants assert that this makes it possible for nine giant industrial users to construct a public water supply system and thus avoid the reach of the statute.

Statutes are presumed to be constitutional unless affirmatively shown to be otherwise, and one who would deny the constitutionality of a statute has a heavy burden. The alleged unconstitutionality must be clearly and exactly shown beyond any reasonable doubt. *Stephenson v. Mitchell ex rel. Workmen's Compensation Department*, Wyo.1977, 569 P.2d 95, 97; see also cases digested at West's Wyoming Digest, Constitutional Law, ⊚⇒48(1). One who assails a classification must carry the burden of showing that it does not rest on a reasonable basis, but is essentially arbitrary, and if any state of facts can be reasonably conceived which sustain the classification, such facts will be assumed. *Mountain Fuel Supply Co. v. Emerson*, Wyo.1978, 578 P.2d 1351, 1355; *McGowan v. State of Maryland*, 1961, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393; *Carmichael v. Southern Coal & Coke Co.*, 1937, 301 U.S. 495, 509, 57 S.Ct. 868, 872, 81 L.Ed. 1245, 109 A.L.R. 1327. The one example of possible underinclusiveness (nine industrial users) isolated by appellants will not stand even the most superficial scrutiny. Such a situation would be guided by an entirely different set of statutes. Wyoming Industrial Development and Siting Act, §§ 35–12–101, et seq., esp. § 35–12–107, W.S.1977. It could be assumed that the legislature reasoned that a public water supply system with less than ten service connections could be ably policed by the limited number of users or, further, that public water supply systems with less than ten service connections would not be economically feasible and thus would not require the attention of the State. There is no requirement that when the State undertakes to regulate a certain activity that all aspects and facets of that activity be covered by the regulatory statutes. *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 1966, 384 U.S. 35, 50–51, 86 S.Ct. 1254, 1264, 16 L.Ed.2d 336; *Williamson v. Lee Optical of Oklahoma*, 1955,

348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563; *Roschen v. Ward*, 1929, 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722. The appellants have not carried their burden as outlined above, and we will not consider the alleged unconstitutionality of the statute further.

■ Appellants assert the court erred in not directing a verdict for appellants at the close of all evidence. This is premised on the position that it was Nickelson Little Farms Water Company that committed all of the proscribed acts and not the individual appellants. The testimony that established the violations was that of the appellant Mader. Much of it was corroborated by other testimony including that of the individual who drilled the water well and actually installed the public water supply system at the request of appellants Mader and Nickelson (who were acting as *partners* in the development of the subdivision). The evidence indicates that the corporation in question was formed before the system was installed, but it also plainly demonstrates that the corporation had no real life [15] until the individual landowners in the subdivision bought shares. The corporation could not have constructed or installed the water supply system because its purpose was only to operate the water company for the landowners once they were living in the subdivision. There is *no* evidence to support the view taken by appellants. We can only conclude that the district court correctly refused to direct a verdict for appellants.

Finally, appellants assert that the district court should have instructed the jury as follows:

"Did Nickelson Little Farms Water Company construct, install, modify or operate a public water supply. [sic]"

As outlined above, the evidence adduced at trial simply did not support giving such an instruction. The court properly refused it.

Affirmed.

**15.** The only proof that appellants brought to bear on this matter were the documents used to perfect the incorporation of Nickelson Little Farms Water Company. No attempt was made

by appellants to demonstrate compliance with §§ 17–1–201, et seq., esp. §§ 17–1–205 and 17–1–206, W.S.1977.